Geiger, J.
In the spring of 1917, one Charles K. Tuggle purchased four separate lots, upon each of which he began the erection of a dwelling house. Each lot was mortgaged by him to the Springfield Building & Loan Association to secure the monéy for the erection of said dwelling houses.
The money secured from the Springfield Association was in part applied to a prior mortgage upon said lot made by said Tuggle to the Provident Savings & Loan Association.
-Tuggle entered into contracts with various materialmen to furnish material used in the structures. There was no general contractor, but all contracts for material were made with the owner Tuggle.
, Various sums were advanced as the buildings progressed by the Building & Loan Association to Tuggle; a part of this money he used for the payment of material and work upon the buildings, but before the buildings- were completed -he absconded,-leaving the material men unpáid.
*131 A receiver was appointed who completed the structures. After-wards the various properties were sold, but the proceeds were not sufficient to pay the mortgages and material men. The various material men secured mechanics -liens, and the question now arises upon the distribution of the fund received, as between the mortgages and the liens secured by the material men.
Lot 8834 was purchased by Tuggle from the American Savings & Trust Company, the deed being recorded on February 17 1917, at 2:30 p. m. The lot was mortgaged to the Provident Association for $2,000, vdrich mortgage was received for record February 19th, 1917, at 3.45 p. m. Other mortgages were mad1 upon said lot by Tuggle, which were recorded at a later date.
The Springfield Cement Products Company had a contract for excavating for and construction of the foundation. On the 21st day of February, this company began digging the cellar under a contract with the owner.
The company was paid $123.67 on May 3d, for the work done by it in constructing said foundation.
The Provident Association, under its mortgage paid to Tuggle from March 2d to Slay 15, the sum of $1,325.
On June 8th, a mortgage from Tuggle upon the same lot to the Springfield Association, for $2,600 was received for record. It was agreed between Tuggle and the Springfield Association that the association should have a first lien upon the premises, and on June 8th the association made a check to Tuggle for $1,325, the amount due to the Provident Savings & Loan Association; and Tuggle, together with the attorney for the Springfield Association, went to the office of the Provident Association and paid to it $1,325, whereupon the mortgage to the Provident Association was cancelled.
The Springfield Association paid to Tuggle the sum of $2,200 on said mortgage. The value of this lot, without improvement was $700.
Henry Nicklas conveyed lot 51 to Charles K. Tuggle by deed dated May 7th, and recorded May 10, 1917 at 9:45 a. m. On May 10th, Tuggle mortgaged said lot to The Springfield Associa *132 tion for $2,600, which mortgage was recorded May 10, 1917¿ at 2:35 p. m.
Under this mortgage the Sprinfield-Association in eight installments, beginning .May • 19 and extending to July 6th, paid to Tuggle $2,200. The value of the lot without improvement was $600.
The Cement Products Company excavated for and constructed the foundation for the house, finishing its work on May 12, — beginning the work about one week earlier, — the exact time being uncertain.
The Kissell Improvement Company conveyed lot 10657 to Charles K. Tuggle by deed dated May 24th, and received for record May 28th, 1917, at 2:15 p. m. Tuggle and wife mortgaged said premises to the Springfield Association for $2,600|, which mortgage was receievd for record May 28, 1917, at 2:10 p. m.
The association paid to Tuggle under said mortgage in six installments between June 8th and July 27th, a total of $1,900. The value of the lot, unimproved'was $900.
On May 26th, 1917, the Cement Products Company staked off the foundation preparatory to excavating for the cellar and foundation, and constructing the foundation. On May 28th, 1917, said company commenced digging the cellar, beginning at about 8 o’clock. This company was paid in full for its work after completion.
The Kissell Improvement Company conveyed lot 10670 to Charles K. Tuggle, by deed dated. June 12, and recorded June 18th, 1917 at 9:10 a. m. On June 15th, 1917, Tuggle mortgaged said lot to the Springfield Association for $2,600, the mortgage being received for record June 15th, 1917, at 1:45 p. m. Said association in four installments, between- June 15th and July 27th, paid to Tuggle $1,60Q. The value of the lot without improvement was $900.
The Cement Products Company finished the digging of the cellar on the 14th of June, beginning the work two or three days before, — probably on June 11th. Upon the completion of the work the Cement Company was paid in full.
*133 On' all the lots the materials were furnished and work and labor done by various material men and laborers subsequent to giving of the mortgages, as stated above.
Under the facts stated, the following questions among others, are raised:
First: — From what date do the liens secured by the laborers and material men attach to the property.
Second: — Is the Springfield Building & Loan Association subrogated to the rights of the Provident Savings & Loan Association.
Third: — -From what .dates are the mortgages made to the Springfield Association liens upon the premises — from the date they were recorded, or from the date that the various different installments were paid to the owner of the property.
Fourth: — Are the mortgages to the Springfield Association to ■be considered as construction mortgages, with the rights, privileges and obligations provided by Section 8321-1.
Fifth: — Is there a priority among the various lien claimants having liens on any single lot.
Sixth: — As between the mortgage and the lienors, can the value of the property as improved by the erection of the buildings, be considered as to the value of the unimproved lot, and as to the value of the improvements.
Section 8310 (103 O. L.,369), provides who may have a lien, and it is provided that the same shall be a lien to the extent of the title of the owner at the time the work was commenced or materials were begun to be furnished by the contractor under the original contract.
It is urged by counsel for the building association, that the liens being only to the extent of the title of the owner at the time the work was commenced by the contractor under the original contract, that there could be no contractor entitled to a lien unless there was an original or principal contractor, and that in this case the work having been done under separate contracts with the owner with each person furnishing material or performing labor, and not with the original or principal contractor, that the *134 several persons contracting separately with the owner can not secure a lien under the statute as it now stands, or if he may secure such lien that the separate liens shall be liens from the date that the first labor was performed or first material was furnished under each separate contract with the owner.
The court is of the opinion there may be as many original or principal contractors as there were persons contracting with the owner for any specific part of the work. "Whether their several liéns shall be liens from the date of the first labor performed or material furnished under their several contracts, or shall be a lien from the first labor performed or material furnished towards the construction of the entire building, is not so clear.
Section 8321 (103 O. L., 376), provides that such liens shall be liens from the date of the first labor performed or material furnished by the contractor under the original contract, but said section further provides that if several liens be obtained by several persons upon the same job, they shall have no priority among themselves except in cases of manual labor.
It is urged on behalf of the mortgages, that the word “job” as used in the section clearly indicates a sub-division of the entire structure, and that each person having a separate contract with the owner has a separate job, and that those performing labor or furnishing material under such separate job, shall have no priority but that the several liens shall be controlled by the date of the several contracts, constituting separate jobs upon the entire structure.
There is considerable force in this argument, and it is not without judicial support. For example, it is held in the case of Barber et al v. Reynolds, 44 Cal., 520, that under the California lien act, where there is no written contract for the construction of the building the several liens of the material men and laborers do not relate back to the date of the commencement of the building, but each lien relates back to and takes effect on the date the particular work was commenced or material furnished for which the lien is sought to be enforced. Other eases might be cited to the same effect.
*135 If, however, the statutes are to be so considered it would defeat their purpose, which has always been to give to all persons contributing by their work and material to the final value of the structure the right to participate pro rata in the proceeds of their joint labor.
As far back as the case of Choteau v. Thompson and Campbell, 2 O. S., 114, it was held that:
“As between the lien holders there is no priority. The idea upon which the law proceeds is that the building is the result of the labor and materials of various persons. The work of some must precede that of others, but each contributes his proper share to the value of the structure; its value when finished is derived from these several contributions. The Legislature intended the money, whether arising from the rents or the sale to be distributed pro rata.”
The court, in spite of the fact that there are decisions to the contrary, in other states, is of the view that where liens are secured by several contractors having separate contracts with the owner for distinct parts of the same building, that the several liens obtained by said laborers and material men, shall have no priority among themselves, but that all shall participate pro rata in the proceeds of the sale, irrespective of the date of their separate contracts with the owner.
' Having determined that there can be no priority between several lienholders contributing labor or material to the entire structure, the next question to be determined is from what date the liens shall attach.
Section 8321 further provides that the liens shall be preferred to all other titles, liens or incumbrances which may attach upon said structure, or to or upon the land upon which they are situate, which shall either be given or recorded subsequent to the commencement of said construction, excavation or improvement.
The three words, construction, excavation or improvement are intended to cover all the several different structures enumeráted in detail in Section 8310.
It is urged by counsel for the mortgages that by this provision of the statute, the several liens are to be preferred only to the *136 incumbrances that are filed subsequent to the date of the several separate contracts with the owner under which each laborer or material man performed labor or furnished material.
The court is of the opinion, however, that it is not possible to give the words, “construction, excavation or improvement” so. narrow a meaning.
It would appear to the court that the meaning of the statute is that all liens obtained, for any labor done or material furnished towards the construction of any given structure, such as the houses in question, shall be preferred to any incumbrances which are recorded subsequent to the commencement of such structure, and therefore it is necessary to determine what act was the commencement of the construction of the finished house.
It has been held in many cases that a given structure is begun where, in good faith, some laborer or material man has performed such labor or furnished such material, under a contract with the owner, as will be easily distinguished by a person examining the lot, to be the beginning of the structure.
Am. Digest, Cent. Ed. Mechanics Liens, Secs. 209, 304; Am. Digest, Dec. Ed. Mechanics Liens, Section 173; Keer-Murray Manufacturing Co. v. Kalamazoo, 124 Mich., 111; Kay v. Towsley, 113 Mich., 281.
The court is aware that many other cases might be cited to the contrary, but it appears to the court that this construction will be in harmony with the policy in reference to mechanics liens, as expressed in the Ohio statutes and enunciated in Ohio decisions.
The court therefore holds that the mechanics liens, while they have no priority among themselves, will all date back as liens to the time when the first work was begun towards the erection of the structures, upon the several lots, under contracts with the owner. The first work was begun when the excavation for the foundation and cellar was commenced.
Second. — The next question to be considered is in reference to the mortgage to the building association on lot 8834.
On February 19th, 1917, a mortgage was executed to the Provident Association by the owner, in the sum of $2,000|. On June *137 6th, the owner mortgaged said lot to the Springfield Association for the sum of $2,600, and the Springfield Association paid to the owner, $1,325 which was immediately paid by the owner to the Provident Association, in accordance with his agreement with the Springfield Association, that it was to have a first mortgage upon said premises.
It is claimed by the Springfield Association that it was subrogated to all the rights of the Provident Association under its mortgage.
The court is of the opinion that the matter is settled by the principles laid down in Amick v. Woodworth et al, 58 O. S., 86, and Straman v. Rechtine et al, 58 O. S., 443, in which eases it is held where a loan is made on an agreement that the mortgage shall be a first lien on the property, then incumbered with other liens, that are paid off out of the money loaned, which liens are so paid in order to give the lender the promised security that the lender is neither a stranger nor volunteer, and when the money is loaned under such agreement, and it is so used, and through an oversight as to other liens the money can not be made on the mortgage, the mortgagee has the right to be subrogated to the lien which was paid out of the money by him loaned.
The evidence in this case brings the transaction in reference to the Provident Association mortgage within the reasoning of these two cases, and the court is of the opinion that the Springfield Association is subrogated to all the rights of the Provident Association.
Third. — The next question raised has to do with the mortgages upon these premises to the Springfield Association:
The mortgages were given and recorded as above set out, but the payments to the owner under the mortgages were made in installments, as the work of construction progressed, the money being paid under each mortgage in from four to eight different installments.
It is claimed by the lienors that inasmuch as the money secured by the mortgages was not paid until the work progressed, that the mortgages were effective liens against the real estate only as payments were made.
*138 This question was raised in the ease of Schaudt v. Trout, in which case Judge Kyle held that inasuuch as the mortgagee was obligated to pay the amount of money named in the mortgage, and inasmuch as the subsequent contractors had notice of such mortgage, that the mortgage in its entirety was prior to the liens subsequently secured by the lien claimants for work performed by them before the several installments were paid.
In the ease at bar, the oral testimony of the officers of the association is to the effect that it was agreed between them and the mortgagor that the money was to be paid out only as the work progressed and they would be under no obligation to pay it to the mortgagor unless he proceeded with the construction of the building.
The vacant lots were respectively valued at $600, $700, and two at $900. All the mortgages were for $2,600 so that it is evident that the building- association did not rely upon the value of the vacant lots for its security and this is testified to by the officers of the association.
It has been decided in O-hio that a mortgage with a clause to secure future advances will be postponed to a lien secured prior to the making of such future advances, to the extent of such future advances. Spader et al v. Lawler, 17 O. S., 371; Choteau v. Thompson, 2 O. S., 114.
In the case of West v. Klotz, 37 O. S., 420, the court says, on page 427:
“It-is certainly true that this court-has held that where a mortgage is given to secure future advances, a subsequent mortgage will have priority over it as to any advances made after such subsequent mortgage is placed on record (citing eases above). We are not disposed to intimate any dissatisfaction with this rule.”
The court in the case of West v. Klotz did not find it necessary to decide whether the rule controlled in the mortgage then under consideration.
In the case at bar, while it appears that' the money was to be paid out only as the work progressed, it is true that the mort *139 gagee was under obligation to pay the money to the extent of the mortgage as the structures progressed.
The true rule in reference to advances made under mortgages, seems to be that if the mortgagee is under no obligation to pay to the mortgagor the future advances, the mortgage will not be good as to liens intervening between the installments paid to the mortgagor, but if the mortgagee is obligated to pay to the mortgagor the money on the happening of a given event then the mortgage is good for the entire sum from the date' of its filing.
A ease of this kind is that of Whelan v. Trust Company, 214 Mass., 121, where it is held that if the mortgage was given to secure the successive advances that the mortgagee was bound to make under the construction loan contract with the mortgagor, in such ease it is immaterial that only a very small portion of the money had been advanced when the mechanic, claiming the lien, made his contract, the court holding that the mortgage is a prior lien for the entire sum named in the mortgage.
The case of Gray v. McClelland, 214 Mass., 92, is a case in which a mechanic’s lien is held to be superior to the subsequent payments under the mortgage for the reason that such payments were optional and not obligatory. The court is therefore of the opinion that the mortgages to the building association are liens from the date of the filing of said mortgages for the entire amount paid out under said mortgages in the several subsequent installments, the mortgagee being obligated to pay as the work progressed.
. Fourth. — It is claimed by counsel for the building and loan association that these mortgages fall within the provision of Section 8321-1 (105-106 O. L., 531), which provides that a lien of a mortgage given to improve real estate, or to pay off' prior incumbrances, the proceeds of which are entirely used in such improvement, or to pay off prior incumbrances, which mortgage contains the correct name of the mortgagee, together with the covenant between the mortgagee and the mortgagor, authorizing the mortgagee to do all the things provided by the mortgage to be done, shall be prior to all mechanics liens, to the extent that the *140 proceeds are used for the purposes, and pursuant to the section, and that such mortgage shall be a lien on the property from the time it is filed for record, for the full amount that is actually paid out under such mortgage, regardless of the time the money secured thereby is advanced.
All these building and loan mortgages are the ordinary form of building and loan mortgages in use for many years prior to the passage of this section of the statute and while they contain the correct name and address of the moregagee, they do not contain any covenants between the mortgagee and mortgagor, authorizing the mortgagee to do the things provided in the act.
Therefore, in the opinion of the court, they are not construction mortgages, and are not entitled to all the privileges provided by said section. But while they are not strictly statutory construction mortgages, the court is of the opinion that as to any money that was paid out under these mortgages, and actually went into the payment of any laborers or material men, that to this extent the payment of money by the mortgagee should in equity be considered as applied to the claims of the lienors, and to that extent the mortgages should be subrogated to the rights of the lien holders, in as much as such lien holders were paid with money belonging to the building association.
Of course as to any money that was paid to Tuggle which did not reach the lien holders, the mortgagee would have no right.
If upon final distribution of the fund, it appears that any lien holder received a larger proportion of the money due to bim by reason of the fact that he received money from the building association, to the extent of such excess so received by such lien holder by reason of such payment by the building association, the building association should have no right of subrogation.
In other words, the building association would have the right of subrogation only to the extent the payments made by it, which went to the lien holders, benefited all of the lienors.
Fifth. — The court has already held that the lien claimants have no priority among themselves on the money arising from the sale of any particular lot.
.Sixth — It is claimed by the lienors that their liens attach to *141 the structure prior to the mortgage, and that there should be a finding as to the value of the property without the structures, and while as to the naked lot the mortgagee might have a first lien, as to the value of the lot enhanced by the structure placed thereon, they are entitled to first liens in accordance with the principles laid down in Choteau v. Thompson and Campbell, 2 O. S., 114.
The court does not believe that, under our statutes, there can be such a separation of the title to the unimproved lot and the title to the lot as enhanced in value by the improvement, as would permit this to be done.
The court believes the principles laid down will enable counsel to draw the proper entries in relation to the specific liens, and set out in the pleadings. See Rider v. Crobaugh, decided by Supreme Court, May 13, 1919.